**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
_____

CYNTHIA ARCHER,

                **Plaintiff,**

v.                                    **Case No. 15-cv-0922**

JOHN CHISHOLM, et al.,

                **Defendants.**
_____

## DECISION AND ORDER

The plaintiff Cynthia Archer, who was an aide to Scott Walker when he was Milwaukee County executive and, briefly, second in command at the Department of Administration when Walker was elected governor of Wisconsin, brings this § 1983 action against Milwaukee County District Attorney John Chisholm and several of his assistants and investigators. Before me now are several motions brought by the defendants including motions to dismiss based on immunity and a motion regarding the custody of records potentially relevant to the case. The case arises out of two highly publicized criminal investigations. To fully understand the issues presented, it is helpful to have some understanding of the case's context. Thus, before analyzing the pending motions, I will briefly summarize the background of the case.

### I. Background

The investigations in question were John Doe investigations (hereinafter "John Doe I" and "John Doe II"). A John Doe investigation is a secret investigation conducted by a prosecutor somewhat like a grand jury investigation. Wisconsin courts have conducted John Doe-type investigations since before Wisconsin became a state. _State v. Washington_, 83 Wis. 2d 808, 819 (1978) (noting that John Doe proceedings were first

developed in 1839). A John Doe investigation must be authorized by a judge, and it is supervised by a judge. *See* Wis. Stat. §§ 968.02–04. Like a grand jury investigation, a John Doe's principal advantage as an investigative tool is that it enables prosecutors to compel testimony from citizens who might decline to provide it voluntarily. *Washington*, 83 Wis. 2d at 822–23.

John Doe I began in 2010, when Walker was Milwaukee County executive. Chisholm and his assistants conducted the investigation. The investigation began with an inquiry into the misappropriation of funds from a veterans' charity and subsequently uncovered evidence of an unlawful campaign fundraising operation being run out of Walker's office. Chisholm's office convicted six people of crimes, including three of Walker's staff members all charged with doing campaign work on government time.

Tim Russell, a former deputy chief of Walker's staff, pleaded guilty to stealing from the veterans' charity and was sentenced to two years in prison and 5 years of extended supervision. *See State v. Russell*, No. 12-CF-053 (Milwaukee Cty., Wis. filed Jan. 5, 2012). Kelly Rindfleisch, another Walker aide, was sentenced to six months in jail after pleading guilty to felony misconduct in office for doing fundraising work on county time. *See State v. Rindfleisch*, No. 12-CF-438 (Milwaukee Cty., Wis. filed Jan. 26, 2012). Darlene Wink, who was in charge of constituent services, pleaded guilty to two misdemeanor counts of political solicitation by a public employee for doing campaign work while being paid by county taxpayers. *See State v. Wink*, No. 12-CM-579 (Milwaukee Cty., Wis. filed Jan. 26, 2012). Other individuals were also convicted. Kevin Kavanaugh, the treasurer of the veterans' charity, was found guilty of felony theft and sentenced to 2 years in prison and 2 years of extended supervision.

*See State v. Kavanaugh*, No. 12-CF-052 (Milwaukee Cty., Wis. filed Jan. 5, 2012). William Gardner, owner of the Wisconsin & Southern Railroad Co., pleaded guilty to making excessive political contributions and intentionally unlawful political contributions after the investigation discovered that he was contributing to Walker's gubernatorial campaign through other people. *See State v. Gardner.* No. 11-CF-137 (Washington Cty., Wis. filed Apr. 11, 2011). Finally, Brian Pierick, Russell's boyfriend, was found guilty of intentionally contributing to the delinquency of a child. *See State v. Pierick*, No. 12-CF-022 (Waukesha Cty., Wis. filed Jan. 5, 2012).

John Doe I also involved an investigation into the bidding process for county projects. After being notified of impropriety in the process, the defendants investigated whether county officials were giving companies associated with John Hiller, the treasurer of Walker's gubernatorial campaign committee, special advantages. In the course of the investigation, the defendants learned that the plaintiff had communicated with Hiller about bid proposals. *See* Answer Ex. 11 (ECF No. 19-11) (search warrant and affidavit for the plaintiff's office); Ex. 18 (ECF No. 19-18) (search warrant and affidavit for the plaintiff's home). Pursuant to search warrants, the defendant investigators searched her office in the Milwaukee County courthouse and subsequently her home in Madison. After the search of her home, the plaintiff cooperated with the investigation, received immunity, and was not charged with any offense. *See* Am. Compl. ¶ 165 (ECF No. 17).

In November 2010, Walker was elected governor, and in 2011, the legislature enacted his controversial proposal regarding public employee unions known as Act 10. This legislation sparked a number of recall elections in which Democrats attempted to

unseat Walker and several state senators. John Doe I unearthed evidence indicating unlawful coordination between Walker's campaign committee and supposedly independent groups such as the Wisconsin Club for Growth ("WiCFG") and Wisconsin Manufacturers and Commerce ("WMC") during the 2012 recall election campaign. Long-standing Wisconsin law provided that if a candidate's committee coordinated campaign activities with a supposedly independent group, spending by the independent group had to be treated as a campaign contribution subject to reporting laws. *Wis. Coal. for Voter Participation, Inc. v. State Elections Bd.*, 231 Wis. 2d 670, 681 (Ct. App. 1999). Federal law is to the same effect. *O'Keefe v. Chisholm*, 769 F.3d 936, 941 (7th Cir. 2014). In the context of Walker's campaign, this meant that the applicable contribution limit would have been greatly exceeded.

In the fall of 2012, the evidence of unlawful coordination led a judge to authorize John Doe II.[1] John Doe II commenced in Milwaukee County, and its purpose was to explore the matter of the unlawful coordination. It soon became clear that individuals residing outside Milwaukee County were potential subjects of the investigation. Thus, in January 2013, because of the scope of the investigation, Chisholm, a Democrat, asked J.B. Van Hollen, the Republican attorney general of Wisconsin, to take over the investigation. Citing possible conflicts, Van Hollen declined. Compl. Ex. B, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014) (letter from J.B. Van Hollen declining

---

[1] The plaintiff was not a subject of John Doe II. Her amended complaint, however, contains many allegations concerning it. According to the plaintiff, this is so because John Doe II supports her allegation that John Doe I was retaliatory.

4

involvement in the John Doe II investigation).[2] Van Hollen did, however, recommend that the Government Accountability Board ("GAB"), a six-member board consisting of retired non-partisan judges which was responsible for regulating Wisconsin elections, get involved. *Id.* In June 2013, after reviewing the evidence, the GAB voted to join the investigation. The Board's chair, a former Republican legislator, noted that the Board had been presented with "credible, hard evidence that the law had been violated." Letter from Hon. Gerald C. Nichol, Chair, Government Accountability Board, to Hon. Robin Vos, Wisconsin state representative (Jan. 22, 2015).[3] Because the individuals being investigated in John Doe II lived in at least five counties, five district attorneys became involved, including Republicans and Democrats. At the request of these district attorneys, the supervising judge appointed a special prosecutor, Francis Schmitz, to run the investigation. Schmitz was a long time federal prosecutor and a Republican who in one filing disclosed that he had voted for Walker in the recall election. *See* Def. Schmitz's Suppl. Opp'n to Pls.' Mot. for Prelim. Inj. at 15, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Apr. 15, 2014).

Documents inadvertently unsealed by the court provide an indication of the kind of evidence that had been uncovered regarding unlawful coordination. The evidence had led Schmitz to conclude that Walker and several Republican operatives were involved in an expansive "criminal scheme" to evade campaign finance disclosure laws

---

[2] Unredacted version available at http://www.jsonline.com/news/statepolitics/documents-hundreds-of-pages-in-john-doe-probe-released-263847071.html.

[3] Available at gab.wi.gov/sites/default/files/news/70/ltr_nichol_to_vos_01_22_2015_final_signed_pdf_11835.pdf.

by coordinating with WiCFG and other organizations. Compl. Ex. C at 12–18, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014) (state's consolidated response to motions to quash a subpoena in John Doe II).[4] The evidence included:

> – emails from Walker's staff advising him to "[s]tress that donations to WiCFG are not disclosed" and to tell donors "that you can accept corporate donations and it is not reported;"

> – a $1 million deposit into WiCFG from Stephen Cohen, founder of SAC Capital Advisers, shortly after Walker was scheduled to meet with an SAC representative;

> – a March 2012 email from Walker to his fundraiser stating that "Bruce and Susie Kovner said that they want to give more" and 10 days later a $50,000 check from Bruce Kovner arrived in WiCFG's account. The check's memo line read "501c4-Walker;" and

> – a 2012 email from Walker's fundraiser to Walker regarding "meetings to make happen while in Sea Island . . . Paul Singer: Grab him." A few months later, $250,000 was deposited into WiCFG's account from Singer.

Def. Schmitz's Suppl. Opp'n to Pls.' Mot. for Prelim. Inj. at 4–6, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Apr. 15, 2014).[5]

The evidence uncovered also indicated that some of the secret contributors to WiCFG appear to have subsequently benefited from state action. Pet. for a Writ of Cert.

---

[4] Unredacted version available at http://www.jsonline.com/news/statepolitics/ documents-hundreds-of-pages-in-john-doe-probe-released-263847071.html.

[5] Unredacted version available at http://www.jsonline.com/news/statepolitics/ documents-governor-scott-walker-encouraged-donations-to-wisconsin-club-for-growth-john-doe-272369371.html.

at 8, *Chisholm v. Two Unnamed Petitioners*, 15-1416 (U.S. Supreme Ct. May 23, 2016). For example, John Menard, who runs a chain of big box stores in Wisconsin, contributed $1.5 million to WiCFG. *Id.* at 9. Subsequently Menard's company was awarded up to $1.8 million in tax credits from a state economic development corporation chaired by Walker. *Id.* Another contributor to WiCFG was a mining company, Gogebic Taconite LLC, which wanted to open a large open-pit iron mine and secretly gave $700,000 to WiCFG. *Id.* at 8–9. Soon after the 2012 recall and general elections, the legislature passed the bill easing environmental regulations that Gogebic sought, *id.*, and Walker signed it.

Regarding unlawful coordination, the special prosecutor also uncovered evidence indicating that the same individual, R.J. Johnson, was running both Walker's campaign committee and a supposedly independent outside group. Compl. Ex. C at 7–9, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014).[6]

The opponents of the John Doe investigations launched a full blown campaign against the investigations and against the defendants. Led by WiCFG director, Eric O'Keefe, the John Doe opponents brought four separate lawsuits, including the present action, challenging the defendants' conduct. Represented by David Rivkin of the Washington D.C. office of Baker and Hostetler, who also represents the plaintiff in the present case, O'Keefe sued the prosecutors, Schmitz and Chisholm, in federal court[7]

---

[6] Unredacted version available at http://www.jsonline.com/news/statepolitics/ documents-hundreds-of-pages-in-john-doe-probe-released-263847071.html.

[7] *O'Keefe v. Schmitz,* No. 14-0139 (E.D. Wis. filed Feb. 10, 2014).

Case 2:15-cv-00922-LA   Filed 05/26/16   Page 7 of 43   Document 82

and also brought an original action challenging John Doe II in the state supreme court.[8] In addition, O'Keefe sued the GAB in circuit court in Waukesha County.[9]

In their court filings, the opponents of John Doe II did not deny that Walker and WiCFG had coordinated. Rather, they asserted that the First Amendment barred applying anti-coordination laws to groups like WiCFG that only presented "issue ads," ads that stopped short of expressly telling viewers how to vote. *See, e.g.*, Compl. ¶ 197, *O'Keefe v. Schmitz*, No. 14-cv-139 (E.D. Wis. Feb. 10, 2014). This legal position directly contradicted Wisconsin case law which held that expenditures for issue advocacy "that are 'coordinated' with, or made 'in cooperation with or with the consent of a candidate . . . or an authorized committee' [are treated] as campaign contributions." *Wis. Coal. for Voter Participation, Inc.*, 231 Wis. 2d at 681 (quoting *Buckley v. Valeo*, 424 U.S. 1, 46–47 (1976)); Wis. El. Bd. Op. 00-02 (reaffirmed Mar. 26, 2008). *See also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 202–03 (2003) (rejecting the idea that federal campaign finance statutes are limited "such that coordinated expenditures for communications that avoid express advocacy cannot be counted as contributions").

In his suit in federal court, O'Keefe sought to enjoin John Doe II, alleging that the prosecutors initiated it to retaliate against Walker's opponents in violation of the First Amendment. The Seventh Circuit, however, rejected O'Keefe's claim, stating that neither the Supreme Court nor any court of appeals had ever held that the First

_____

[8] *State ex rel. Two Unnamed Petitioners v. Peterson*, No. 2014AP296-OA (Wis. Supreme Ct. filed Feb. 7, 2014).

[9] *O'Keefe v. Wis. Gov't Accountability Bd.,* No. 14CV01139 (Waukesha Cty., Wis. filed May 30, 2014).

Amendment forbids regulation of coordination between campaign committees and issue advocacy groups, let alone an inquiry into that topic. *O'Keefe*, 769 F.3d at 942.

O'Keefe and the other John Doe II opponents fared better in the original action that they brought in the state supreme court. In a 4-2 decision that broke along ideological lines, the Wisconsin supreme court shut the investigation down. The court adopted the theory put forward by the opponents of the investigation, that the First Amendment barred the John Doe II prosecutors from applying Wisconsin's anti-coordination law to entities like WiCFG which only spent money on issue ads. *State ex rel. Two Unnamed Petitioners v. Peterson,* 363 Wis. 2d 1 (2015). The decision overturned years of precedent and practice in Wisconsin. Justices Abrahamson and Crooks separately dissented. The prosecutors filed a petition for a writ of certiorari in the United States Supreme Court, which is presently pending.

The plaintiff now brings this lawsuit against the defendants alleging violations of her civil rights, including First Amendment retaliation claims and numerous Fourth Amendment claims.

## II. Immunity

The prosecutor and investigator defendants filed motions to dismiss based on immunity from liability for damages. I turn now to these motions. Where, as here, immunity is raised as an affirmative defense in a motion to dismiss, I consider only the facts alleged in the complaint, which I accept as true. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997). While I have cited other public documents in outlining the background of the case, in addressing the pending motions, I consider only the plaintiff's allegations.

9

State actors who are defendants in § 1983 cases may be entitled to absolute or qualified immunity. The purpose of the immunity doctrine is to shield public officials from retaliatory litigation and the threat of such litigation so that they are not inhibited or otherwise precluded from doing their jobs properly. *See Imbler v. Pachtman*, 424 U.S. 409, 422–23, 428 (1976) (noting that the purposes underlying absolute immunity "include concern [about] harassment by unfounded litigation" and "the possibility that [a public official] would shade his decisions instead of exercising the independence of judgment required"); *Davis v. Scherer*, 468 U.S. 183, 195 (1984) (stating that the purpose of qualified immunity is to allow officials to "act without fear of harassing litigation").

Prosecutors are entitled to absolute immunity "for conduct that is functionally prosecutorial." *Bianchi v. McQueen*, No. 14-1635, 2016 WL 1213270, at *4 (7th Cir. 2016). "This immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal process." *Id.* Prosecutors are also absolutely immune for administrative and investigatory conduct that "relate[s] to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

Judicial proceedings are not limited to trials but rather include "'any hearing before a tribunal which perform[s] a judicial function.'" *Burns v. Reed*, 500 U.S. 478, 489–90 (1991) (quoting W. Prosser, Law of Torts § 94, at 826–27 (1941)). Thus, prosecutors have absolute immunity for "initiating a prosecution and in presenting the State's case," *Imbler*, 424 U.S. at 431; appearing at a probable cause hearing for a

search warrant, *Burns*, 500 U.S. at 487; evaluating evidence assembled by police, *Buckley*, 509 U.S. at 273; preparing for trial or a grand jury appearance, *id.*; and applying for an arrest warrant, *Thomas v. City of Peoria*, 580 F.3d 633, 639 (7th Cir. 2009) (citing *Kalina v. Fletcher*, 522 U.S. 118, 129–31 (1997)). In determining whether a particular action is entitled to absolute immunity, I consider its function and whether such function is "intimately associated" with the judicial rather than investigation phase of criminal proceedings. *Buckley*, 509 U.S. at 269–70 (citations omitted).

If a state actor is not entitled to absolute immunity, she may still be entitled to qualified immunity. She is entitled to qualified immunity unless (1) the plaintiff plausibly pleads that she violated a constitutional right, and (2) the constitutional right was clearly established at the time of the alleged violation. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). In determining whether a plaintiff has plausibly pled a claim, I assume that all of the factual allegations in the complaint are true, and I draw all reasonable inferences in the plaintiff's favor. *Chasensky v. Walker*, 740 F.3d 1088, 1093 (7th Cir. 2014). Because qualified immunity is meant to spare public officials from the burdens of litigation, it "should be resolved at the earliest possible stage of litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). If a defendant asserts that she is entitled to qualified immunity, the plaintiff bears the burden of defeating the immunity claim. *Betker*, 692 F.3d at 860. I turn now to the immunity issue insofar as it relates to each of the plaintiff's claims.

**A. Fourth Amendment Search Claims**

The plaintiff alleges that the searches of her office in the Milwaukee County courthouse and of her home violated the Fourth Amendment. The defendants obtained

search warrants for both of the searches. The plaintiff's response to the existence of the warrants is to challenge their validity. In order to prevail on her challenge, the plaintiff had to have a legitimate expectation of privacy in the space covered by the warrant. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). This depends on 1) whether the plaintiff exhibited an actual expectation of privacy, and 2) whether her expectation was reasonable. *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007).

With respect to the search of her county office, both the plaintiff's allegations and the office warrant[10] establish that at the time the warrant was obtained and executed

--------------------------------

[10] In evaluating the plaintiff's claim, I may consider the office and home warrants because the complaint refers to them and because they are central to her Fourth Amendment claims. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) (stating that "a defendant may introduce certain pertinent documents if the plaintiff failed to do so" and that such documents "are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim"). The plaintiff argues that I may not consider the warrants because they are not "concededly authentic." *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) (stating in dicta that such documents must be "concededly authentic"). The purpose of the "concededly authentic" requirement is to prevent consideration on a motion to dismiss of a document that "require[s] discovery to authenticate or disambiguate." *Id.* at 739. Here, the plaintiff does not argue that the copies of the warrants submitted by the defendants are inauthentic. Further, they contain a file stamp from state court, evidence that the copies the defendants provided are the authentic court-issued warrants. Therefore, I will consider the warrants. *See ABN AMRO, Inc. v. Capital Int'l, Ltd.*, No. 04 C 3123, 2007 WL 845046, at *11 (N.D. Ill. Mar. 16, 2007) (considering documents central to plaintiff's claims where plaintiff argued that documents were unauthenticated but did not assert that they were inauthentic). Further, I may take judicial notice of the warrants, which are publicly available court records. *Sherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013) (stating that a court may take judicial notice of court records); *see also Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (stating that a court my take judicial notice of a public record on a motion to dismiss).

I may also consider the affidavits supporting the warrants, which the warrants reference and which were file-stamped with the warrants. The plaintiff argues that the warrants did not incorporate the affidavits because when served the affidavits were not physically appended. *See United States v. Jones*, 54 F.3d 1285, 1290–91 (7th Cir. 1995). However, the plaintiff did not allege this in her complaint. Further, the language of the warrants explicitly incorporate the affidavits, and the affidavits were file-stamped

the plaintiff was no longer employed by Milwaukee County. The plaintiff alleges that in November 2010, she left county employment and joined Walker's gubernatorial transition team. Am. Compl. ¶ 23 (ECF No. 17). She further alleges that the defendants did not obtain the warrant until December. *Id.* ¶ 104. The affidavit supporting the warrant indicates that the plaintiff officially left county employment on December 10, and the warrant was issued on December 17. Answer Ex. 11 at 7 (ECF No. 19-11). Because the plaintiff was no longer employed by the county when the warrant was executed, she abandoned the county office and computer previously issued to her and no longer had a legitimate expectation of privacy in them. *See United States v. Procknow*, 784 F.3d 421, 426–27 (7th Cir. 2015) (concluding that a person who checks out of a hotel no longer has a privacy interest in his hotel room). Thus, the plaintiff fails to plausibly plead a Fourth Amendment claim relating to the search of her office.

### 1. Absolute immunity

With respect to the search of her home, I first note that most, if not all, of the plaintiff's allegations against the prosecutor defendants can be resolved quickly. As discussed, to the extent that the plaintiff's allegations involve the prosecutors' representations to the John Doe judge to obtain the search warrants, the prosecutors are entitled to absolute immunity, *Burns*, 500 U.S. at 487, even if they acted maliciously or misrepresented facts, *id.* at 485. The rest of the plaintiff's allegations concern the execution of the warrant, and she does not allege that the prosecutor defendants took part in this process. Under § 1983, the prosecutor defendants may be held liable only

---

on the same date as the warrants. Answer Ex. 11 (ECF No. 19-11) (office warrant and affidavit); Ex. 18 (ECF No. 19-18) (home warrant and affidavit).

for personal conduct. *Gossmeyer*, 128 F.3d at 495 (7th Cir. 1997). Thus, they have no liability for the search of the plaintiff's home.

### 2. Qualified immunity – validity of warrant

Turning to qualified immunity, again, to overcome qualified immunity the plaintiff must plausibly allege that the defendants violated a constitutional right, and that the right was clearly established at the time of the violation. The plaintiff does not meet this burden because she fails to plausibly allege that the defendants violated her Fourth Amendment rights in any respect.

The plaintiff first attacks the validity of the search warrant for her home. In order for a search warrant to be valid, it must (1) be issued by a neutral, disinterested magistrate; (2) establish probable cause that the evidence sought will aid in obtaining a conviction of a particular offense; and (3) particularly describe the things to be seized and the place to be searched. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Even where a warrant is invalid for one of these reasons, an officer ordinarily acts reasonably, and is therefore entitled to qualified immunity, if the warrant is judicially-authorized. *Malley v. Briggs*, 475 U.S. 335, 344–45 (1993); *United States v. Leon*, 468 U.S. 897, 920–21 (1984); *Junkert v. Massey*, 610 F.3d 364, 369 (7th Cir. 2010). An officer is not expected to question a judicial determination. *Leon*, 468 U.S. at 920–21. Only where it is objectively unreasonable for an officer to rely on a judicially-approved warrant will qualified immunity be withheld. These situations include: (1) where the judge was misled by false or reckless information, (2) where the magistrate wholly abandoned his judicial role, (3) where the warrant totally lacked the indicia of probable cause, and (4)

where the warrant was facially deficient as for example being insufficiently particularized. *Id.* at 923.

### a. Neutral magistrate

The plaintiff first contends that the John Doe I judge, Neal Nettesheim, a long time Wisconsin circuit and appellate court judge, was not a neutral magistrate but acted as a "'rubber stamp' for the Defendants' agenda and made no effort to scrutinize the legal or factual basis for the requested warrants and subpoenas." Am. Compl. ¶ 78. Of course, a John Doe judge "must conduct himself as a neutral and detached magistrate." *Washington*, 83 Wis. 2d at 824 (internal quotations and citation omitted). This "require[s] severance and disengagement from activities of law enforcement." *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). However, a judge is presumed to be neutral and detached. *See Aleman v. Honorable Judges of Circuit Court of Cook Cty.*, 138 F.3d 302, 307 (7th Cir. 1998). The plaintiff's "rubber stamp" allegations concerning Judge Nettesheim are conclusory and merely appropriate language from the *Leon* case. *See Leon*, 468 U.S. at 914. The plaintiff provides no allegations of fact in support of her assertion that Judge Nettesheim was biased or not neutral. *See Shadwick*, 407 U.S. at 350–51 (concluding that plaintiff failed to impeach a magistrate's neutrality because he made "no showing whatsoever . . . of partiality, or affiliation of [the magistrate] with prosecutors or police"). Thus, her claim that Judge Nettesheim was not a neutral magistrate fails. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that conclusory allegations in a complaint may be disregarded).

<u>b. Probable cause</u>

The plaintiff next alleges that the warrant was not based on probable cause. "Probable cause is a fluid concept [which] turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause exists for a search warrant where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. In examining whether there was probable cause for the warrant, I "give great deference to the conclusion of the judge who initially issued" it. *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011) (internal quotations and citations omitted).

The plaintiff's allegation of a lack of probable cause for the search of her home is contradicted by the warrant. The warrant was based on the defendant Stelter's affidavit, which Judge Nettesheim concluded established probable cause. The warrant indicates that the defendants had reason to believe that the plaintiff had violated Wis. Stat. § 946.12, Wis. Stat. § 11.36, and Milwaukee County Ordinance § 9.06, all of which in various ways prohibit public employees from using their position to inappropriately benefit themselves or others. Answer Ex. 18 at 2–3, 6, 16–18 (ECF No. 19-8) (home warrant and affidavit). The affidavit describes two separate incidents on which the defendants' belief was based.

The first, referred to as the Reuss Plaza lease, involved bidding on a county lease, then held by The Boerke Company. The defendants had been notified of impropriety in the bidding process and believed that county officials were working to favor a particular bidder. *See* Am. Compl. ¶¶ 146–47. The affidavit indicates that several county officials including the plaintiff had ties to John Hiller, the treasurer of Walker's

gubernatorial campaign committee who had an interest in The Boerke Company, which was bidding for renewal of the lease. *Id.* at 18–24. Large Walker donors also had an interest in The Boerke Company. The affidavit contains facts which support probable cause that county officials worked with Hiller to give the Boerke Company an unfair advantage in the bidding process in violation of state law. For example, the affidavit outlines several instances of suspicious timing between events related to the lease negotiations and donations to Walker's gubernatorial campaign, states that county officials failed to follow normal bidding procedures, and cites emails between county officials and Hiller discussing the Reuss Plaza bid. *Id.* Further, the affidavit also establishes probable cause to believe that the plaintiff was involved in this scheme. She sent a series of emails from her personal email account concerning the bidding process, including emails that proposed that Hiller take certain actions relating to the bidding process and that discussed the process with him. *Id.* at 22–24. She sent some of these emails to Hiller directly and some through other county officials. Based on the information in the affidavit, Judge Nettesheim reasonably concluded that county officials attempted to provide Walker associates and funders with an unfair advantage in the Reuss Plaza bidding process. The judge also reasonably concluded that the plaintiff was a party to this.

The second incident outlined in Stelter's affidavit involving the plaintiff concerned the bidding process for county housekeeping services. Defendants suspected Hiller of being a middleman between county officials and a bidder for the housekeeping contract, Mid American Building Services, and they believed that county officials had, at Hiller's request and to advantage Mid American, leaked information about the bidding process

that was supposed to be confidential. This belief too was supported by probable cause. The affidavit states that Hiller exchanged emails with county officials regarding Mid American, states that the county corporation counsel advised the county executive's office that the disclosure of certain information related to the bidding process was prohibited, cites emails in which such confidential information was sent to a conservative blogger who then published the information online, and details several payments from Mid American to Hiller during this time. *Id.* at 29–31. And again, the affidavit also establishes probable cause to believe that plaintiff was involved. It discusses emails sent by the plaintiff from her personal account regarding the bidding to Walker aide, Tim Russell, who forwarded it to a private individual who posted it on a blog owned by Russell. *Id.* at 30–31. Based on this information, Judge Nettesheim reasonably concluded that there was probable cause to believe that county officials had unlawfully disclosed procurement information related to the housekeeping bidding contract with the intent to advantage Mid American in violation of state law, and that the plaintiff was a party to the matter.

c. Particularized warrant

The plaintiff also alleges that the warrant was invalid because it was not particularized. "The Fourth Amendment requires that a warrant particularly describe the place to be searched and the . . . things to be seized." *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The specificity required depends on the circumstances of the case. *Id.* Generic descriptions of items to be seized are sufficient if "the warrant more specifically identifie[s] the alleged criminal activities in connection with which the items [are] sought." *Id.* at 964; *see also United States v. Henson*, 848 F.2d 1374,

18

1382–83 (6th Cir. 1988) (stating that "a description is valid if it is as specific as the circumstances and nature of the activity . . . permit"). As noted, in determining whether a warrant is sufficiently particularized, I may consider both the warrant and Stelter's affidavit because the warrant incorporated the affidavit by reference. *Spilotro*, 800 F.2d at 967.

Again, the warrant contradicts the plaintiff's allegations. The warrant describes the place to be searched, the plaintiff's residence, and specifies the items to be seized, namely "records and information relating to" the Reuss Plaza lease and the Mid American housekeeping contract. Answer Ex. 18. Contrary to the plaintiff's assertion, this case is not similar to *Spilotro* in that the warrant here was far more specific. Although it employed descriptive terms such as "records," "documents," and "information," it also referenced both of the statutes allegedly violated and the specific incidents allegedly constituting the violations. Thus, the warrant here differed from the warrant in *Spilotro*, which was "of exceptional scope." *Spilotro*, 800 F.2d at 964. Further, Stelter's affidavit described the Reuss Plaza and Mid American situations in detail, further limiting the scope and eliminating possible confusion about what items were authorized to be seized.

Because the plaintiff fails to sufficiently allege that Judge Nettesheim was not a neutral and detached magistrate or that the warrant was unsupported by probable cause or insufficiently particularized, I conclude that the warrant was valid. Thus, the plaintiff fails to plausibly plead a Fourth Amendment violation and, accordingly, defendants are entitled to qualified immunity.

19

**3. Qualified immunity – justifiable reliance on judicial approval**

However, even if the warrant were invalid, the defendants would still be entitled to qualified immunity if it was reasonable for them to rely on it. *Leon*, 468 U.S. at 920–21. As stated, reliance is objectively unreasonable only (1) where the judge was misled by false or reckless information, (2) where the judge wholly abandoned his judicial role, (3) where the warrant was so lacking in the indicia of probable cause, or (4) where the warrant was facially deficient, e.g. being insufficiently particularized. *Id.* at 923.

a. False, misleading, or reckless information

The plaintiff alleges that the defendants provided Judge Nettesheim with false or misleading information in the Stelter affidavit. "A warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Betker,* 692 F.3d at 860 (internal quotations and citation omitted). Reckless disregard for the truth includes situations in which the officer had serious doubts about the truth of information, had obvious reason to doubt the information, or failed to disclose facts that he knew would negate probable cause. *Id.* at 860. "There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant," and an attack must be more than conclusory. *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *Suarez v, Town of Ogden Dunes*, 581 F.3d 591, 596 (7th Cir. 2009).

The plaintiff alleges that the defendants omitted information from the affidavit that would have negated probable cause such as the fact that the County didn't accept any

of the Reuss Plaza bids, that the letter informing defendants of impropriety in the bidding process stated that it did not affect the County's consideration of bids, and that the plaintiff's undisclosed emails reveal that she opposed awarding the lease to Hiller's company. However, the documents presented to Judge Nettesheim contradict many of the plaintiff's allegations. For example, Stelter's affidavit stated that the bidding process had been canceled, and all emails to and from the plaintiff referenced in the affidavit were attached to it. Investigator Defs.' Br. in Supp. Ex. E at 21 (ECF No. 43-5); Prosecutor Defs.' Br. in Supp. Ex. C at 48, 58–59, 60–64 (ECF No. 21-4) (attachments to home warrant affidavit).

Even if the plaintiff's allegations regarding omissions by defendants were true, however, such omissions would not negate probable cause. As to the alleged omission that none of the Reuss Plaza bids were accepted and that the impropriety in the bidding process did not affect the outcome, Wis. Stat. § 946.12(2) does not require that a dishonest advantage actually be obtained, only that a public employee act "with intent to obtain a dishonest advantage." Thus, the fact that the alleged plan to favor one vendor did not come to fruition does not negate probable cause that Wisconsin law was violated.

The fact that the plaintiff opposed awarding the lease to the favored bidder also does not negate probable cause with respect to her. According to the warrant and affidavit, defendants' theory with respect to the plaintiff was that she aided and abetted others or was part of a broad conspiracy. Under Wisconsin law, a person aids and abets when she "(1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime; and (2) consciously

desires or intends that the conduct will yield such assistance." *State v. Simplot*, 180 Wis. 2d 383, 401–02 (Ct. App. 1993). "The same intent required for conviction as a direct perpetrator of a crime is not required for conviction as an aider and abettor." *State v. Williquette*, 125 Wis. 2d 86, 90 n.1 (Ct. App. 1985); *see also State. v. Stanton*, 106 Wis. 2d 172, 177 (Ct. App. 1982) ("[A] person may be a party to a crime, as aider and abettor or as conspirator, even though the crime committed was not the crime which the defendant intended."). Thus, probable cause with respect to the plaintiff as an aider and abettor does not require evidence that she intended the favored bidder to receive a dishonest advantage. Rather, it requires only a showing that her conduct helped others violate Wis. Stat. § 942.16 and that she intended her conduct to do so. The warrant and affidavit meet this standard insofar as they discuss various pieces of improper information that the plaintiff provided on request to other county officials and in turn to Hiller via her private email.

b. Abandoned judicial role

With respect to the plaintiff's allegations that Judge Nettesheim was not neutral, even assuming that they are true, the plaintiff must allege more to defeat qualified immunity. Only where a judge has "wholly abandoned his judicial role" can an officer or prosecutor be said to have acted unreasonably in relying on a judicially-authorized warrant. *Leon*, 468 U.S. at 923. An example of such abandonment is the behavior of the judge in *Lo-Ji Sales, Inc. v. New York*, who "yielded to the State Police . . . the completion of the . . . warrant;" was present at and "conducted a generalized search;" "allowed himself to become a member, if not the leader, of the search party;" and instructed officers on what to seize. 442 U.S. 319, 327 (1979); *see also Leon,* 468 U.S.

at 923 (citing *Lo-Ji* as an example of "wholly abandon[ing the] judicial role"). Nothing in the plaintiff's complaint indicates that Judge Nettesheim's conduct was even remotely comparable. At worst, her allegations, including those made at oral argument, support the inference that Judge Nettesheim's review of the warrants was not thorough. A lack of thoroughness does not rise to the level of wholly abandoning the judicial role such that it was objectively unreasonable for executive branch employees to rely on his approval of the warrant.

c. Lacking in indicia of probable cause or particularity

Further, I have already concluded that the warrant was supported by probable cause and that it was sufficiently particularized. The analysis that supports those conclusions also supports the conclusion that, even if probable cause was absent or the warrant was insufficiently particularized, it was not so deficient that reliance on it was objectively unreasonable. For these reasons, even if the warrant was invalid, all defendants are entitled to qualified immunity on the plaintiff's Fourth Amendment claims related to the warrant because they reasonably relied on the judicial approval of it.

**4. Qualified immunity – scope of search**

The plaintiff also alleges that defendants exceeded the scope of the warrant in violation of the Fourth Amendment because they searched unauthorized places and seized unauthorized documents. With respect to the places searched, "a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820–21 (1982). The warrant authorized a search of the plaintiff's entire residence. Answer Ex.

Case 2:15-cv-00922-LA   Filed 05/26/16   Page 23 of 43   Document 82

18. Further, the warrant authorized the seizure of small items such as paper documents and electronic storage media like thumb drives and CD-ROMs, giving defendants the leeway to search small spaces within the home where these items may have been located. Thus, the plaintiff's allegation that the investigators should not have searched her bathroom, kitchen cabinets, dresser drawers, and closets is without merit.

As to the plaintiff's objection to the seizure of her computer, phone, and private emails, a search is not unreasonable in scope because of the inadvertent seizure of items not covered by the warrant. *Henson*, 848 F.2d at 1383; *see also Guest v. Leis*, 255 F.3d 325, 334–35 (6th Cir. 2001) (applying *Henson* in the context of § 1983 claims). "This is especially true when the extra-warrant items were not received into evidence against the defendant." *Henson*, 848 F.2d at 1383. Here, the warrant authorized an extensive seizure, and it would be unreasonable to require officers to "sift through the large mass of documents and computer files." *Id.* Further, the warrant here, in fact, authorized the seizure of the plaintiff's computer, phone, and private emails. Moreover, the seizure of the computer and phone, which contained her private emails, was reasonable under the circumstances. "Unlike a physical object that can be immediately identified as responsive to the warrant or not, computer files may be manipulated to hide their true contents." *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010). Thus, it was reasonable for the defendants to seize the plaintiff's computer and phone, and all of the files contained on them, in order to conduct a forensic examination and take time to search for files authorized by the search.

With respect to the plaintiff's contention that the search was unreasonable because defendants failed to return items unauthorized by the warrant, she does not

allee this in her complaint.[11] Thus, even if failing to return the unauthorized items amounted to a Fourth Amendment violation, the plaintiff does not allege such a claim.[12] Further, she cannot use her brief in opposition to the defendants' motions to add the allegation. *See Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989).

Finally, the plaintiff alleges that the defendant investigators behaved unreasonably in other respects during the search. *See, e.g.*, Am. Compl. ¶ 116 (alleging that the defendants "thunderous[ly] hammer[ed] on her front door," yelled at her, and brought a battering ram with them), ¶ 118 (alleging that the defendants tipped off reporters about the search beforehand), ¶ 119 (alleging that officers entered with guns drawn), ¶ 123 (alleging that an officer advised her not to smoke in her home).[13] While the Fourth Amendment does protect against unreasonable behavior during a search and seizure, officer conduct must rise to the level of an unreasonable use or show of

--------------------------------------------

[11] The plaintiff argues that she alleged that the defendants failed to return items to her in paragraph 143 of her amended complaint, but I disagree. Paragraph 143 alleges that "[t]he Milwaukee District Attorney's office took possession of . . . every email Archer wrote or received on her personal email account," that "these emails were released to the public," and that the defendants seized them "to embarrass, intimidate, harass, and retaliate against Archer." Nowhere in this paragraph does the plaintiff allege that the defendants failed to return the documents.

[12] Moreover, the plaintiff does not argue or point to any case law supporting the proposition that a failure to return unauthorized items, in and of itself, amounts to a Fourth Amendment violation.

[13] In her original complaint, the plaintiff alleged additional unreasonable conduct. *See, e.g.*, Original Compl. ¶ 90 (ECF No. 1-1) (alleging that officers "screamed at her and forbade her from leaving the residence, even for a brief period to smoke a cigarette"); *id.* ¶ 87 (alleging that officers "flooded in, throwing the warrant at her without giving her an opportunity to read it"), ¶ 91 (alleging that "[n]o one informed her that she had a constitutional right to remain silent and the right to an attorney"). However, the plaintiff removed these allegations from her amended complaint because they were directly refuted by materials the investigator defendants submitted with their original answer.

force to constitute a violation. *See Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). The question of reasonableness is an objective standard judged from the perspective of a reasonable officer on the scene. *Id.* Here, the allegations do not rise to the level of conduct that the Seventh Circuit has found to be so excessive as to be unreasonable. *See, e.g.*, *id.* (concluding that the use of a submachine gun to round up and detain residents during a search was objectively unreasonable); *Jacobs v. City of Chi.*, 215 F.3d 758, 773–74 (7th Cir. 2000) (concluding that pointing a gun at an elderly man's head for ten minutes after realizing he was not the desired suspect was objectively unreasonable); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (concluding that "officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation"); *McDonald v. Haskins*, 966 F.2d 292, 294–95 (7th Cir. 1992) (concluding that pointing a gun at a nine-year-old child during a search and threatening to pull the trigger was objectively unreasonable). The plaintiff does not allege that she was held at gunpoint or that the officers used or threatened to use force against her in any way. Thus, I conclude that the conduct alleged in the complaint was not objectively unreasonable and thus the plaintiff has not sufficiently pled a claim based on the defendants' conduct during the search. *See McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002) (concluding that "an excessive number of squad cars or drawn guns [does not] violate the fourth amendment by giving fright or offense, if the seizure is supported by probable cause and otherwise reasonable").

The plaintiff also alleges that the defendants leaked other information regarding the John Doe proceeding to the press. *See, e.g.*, Am. Compl. ¶¶ 90–91 (alleging that the defendants leaked information about the John Doe proceeding by filing "overbroad

criminal complaints" and disclosing irrelevant information during sentencing hearings), ¶ 110 (alleging the defendants leaked to the media that the plaintiff was a target of the John Doe investigation), ¶ 172 (alleging that the defendants leaked information to the press, including that they had "bombshell" evidence likely to lead to criminal complaints). Leaking information does not constitute a search, and the plaintiff does not allege that the defendants leaked information obtained during the search of her home or her detention,[14] and thus the leak allegations are not actionable under the Fourth Amendment. *See Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992); *United States v. Kaczynski*, 923 F. Supp. 161, 163 (D. Mont. 1996). Because the plaintiff has failed to adequately plead a Fourth Amendment violation related to the scope of the search, the defendants are entitled to qualified immunity on this claim as well.

**B. First Amendment Retaliation Claim**

The plaintiff also claims that the defendants violated the First Amendment by investigating her as part of John Doe I in retaliation for her work on and advocacy for Act 10. She alleges that many of the defendants' actions were retaliatory, including initiating John Doe I, applying for search warrants as part of John Doe I, misrepresenting information to the John Doe I judge, and making strategic decisions about the direction and scope of John Doe I.

---

[14] The plaintiff alleges that documents obtained during the search "were released to the public" but does not allege that the defendants released them. Am. Compl. ¶ 143. Further, it appears that it was the John Doe judge and not the defendants who made the documents publicly available when he ordered, based on a motion by the *Milwaukee Journal Sentinel*, that documents seized from Milwaukee County and its current and former officials, including the plaintiff, be returned and made subject to Wisconsin's public records law. *See* Order on Mots. for Limited Intervention and Access to Public Records, *In the Matter of a John Doe Proceeding*, No. 10JD000007 (Milwaukee Cty.,

**1. Absolute immunity**

As discussed, a John Doe proceeding is a judicial proceeding, *see Washington*, 83 Wis. 2d 808 (stating that John Doe proceedings are judicial and not executive in nature). And, as stated, prosecutors have absolute immunity for all conduct associated with the judicial phase of a criminal proceeding. Thus, the prosecutor defendants are entitled to absolute immunity for any actions associated with John Doe I. See *Harris v. Harvey*, 605 F.2d 330, 336 (7th Cir. 1979) (holding that prosecutors have immunity for conduct during a John Doe proceeding); *see also Buckley*, 509 U.S. at 273 (stating that absolute prosecutorial immunity applies to preparation and presentation at grand jury proceedings). This includes initiating John Doe I, *Imbler*, 424 U.S. at 431; applying for search warrants, *Burns*, 500 U.S. at 487; misrepresenting information to the judge, *id*. at 485, and making strategic decisions related to the John Doe proceedings, *Buckley*, 509 U.S. at 273.

**2. Qualified immunity – constitutionally protected speech**

In addition, both the prosecutor and investigator defendants are entitled to qualified immunity with respect to the plaintiff's First Amendment retaliation claim. To state such a claim, the plaintiff must allege that (1) her speech was constitutionally protected, (2) she suffered a deprivation likely to deter protected speech, and (3) retaliating against the protected speech was a motivating factor in defendants' actions. *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 861–62 (7th Cir. 2010). The defendants are entitled to qualified immunity on this claim because it was not clearly

---

Wis. June 9, 2014).

established at the time of the violation that the plaintiff's advocacy of Act 10 was constitutionally protected speech.[15]

In *Garcetti v. Ceballos*, the Supreme Court held that a government employee's speech is protected by the First Amendment only when "the employee [speaks] as a citizen on a matter of public concern" and when the speech is not "made pursuant to the employee's official duties." 547 U.S. 410, 418, 420–21 (2006). Speech "made pursuant to [an employee's] duties" is not protected. *Id.* at 421. In determining whether speech is pursuant to an employee's duties, I look beyond the tasks officially assigned to the employee. *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009). Rather, speech which is related to "daily professional job duties" is made pursuant to official duties. *Chrzanowski v. Bianchi*, 725 F.3d 734, 739 (7th Cir. 2013).

The plaintiff's allegations indicate that her work on Act 10 was done pursuant to her official duties as Walker's Deputy Secretary of Administration. The plaintiff alleges that "in [her] role [in the Walker administration], . . . she played a lead role in crafting policy," Am. Compl. ¶ 23; that she was "one of the top government officers in Wisconsin" and "over[saw] most departments" *id.* ¶ 24; that Walker appointed her because of her previous policy experience, *id.* ¶ 25; that she "took a lead role in

_____

[15] The plaintiff argues that she also alleges retaliation based generally on her political affiliation with Scott Walker, which she argues is also constitutionally protected. However, her allegations regarding retaliation based on political affiliation are conclusory and unsupported by factual allegations. The factual allegations in the complaint support only her assertion that the defendants' retaliatory motive was based on Act 10, not a more general political motive. For example, the complaint alleges that Chisholm and his wife were angry about Act 10, Am. Compl. ¶¶ 51, 58, 61, and that the defendants did not begin their so-called "campaign of harassment" until after Act 10's proposal despite longstanding political differences, *id.* ¶ 1, 41, 67, 70. These allegations cut against an inference that the defendants retaliated based on a general political

overseeing the drafting of the legislation" including engaging in review and analysis and advising Walker and other staff, *id.* ¶ 28; and that she "became the point person for responding to Act 10-related inquiries," *id.* ¶ 29. Contrary to the plaintiff's conclusory disclaimer that her role in drafting and implementing Act 10 "was not inherent to her position," *id.* ¶ 27, the overwhelming majority of her allegations indicate that the important role that she played in drafting and implementing Act 10 was precisely because it was inherent in the high-ranking policy-making position that Walker hired her to fill. Thus, the plaintiff's work on Act 10 was done pursuant to her official duties and, if *Garcetti* applies, was unprotected.

It is unclear whether *Garcetti*'s holding that speech made pursuant to a public employee's official duties is unprotected applies in this context. *Garcetti* dealt with government employee speech in the context of alleged retaliation by a government employer. Neither the Supreme Court nor the Seventh Circuit has decided whether advocacy of the type the plaintiff engaged in is protected in the context of retaliation by a non-employer government official. See *Fairley*, 578 F.3d at 524. Other courts have reached varying conclusions. *Compare Trant v. Oklahoma*, 754 F.3d 1158, 1169 (10th Cir. 2014) (concluding *Garcetti* does not apply when defendant is not plaintiff's employer); *Leavey v. City of Detroit*, 719 F. Supp. 2d 804, 812 (E.D. Mich. 2010) (same); *Stokes v. City of Mount Vernon*, No. 11 CV 7675(VB), 2012 WL 3536461, at *7 (S.D.N.Y. Aug. 14, 2012) (same); *Price v. Roberts*, No. 10-1574, 2011 WL 1877823, at *16 (W.D. Pa. May 16, 2011) (same), *with Rowe v. Benjamin*, No. 3:12-cv-01201-JFA, 2012 WL 5306159, at *4 (D.S.C. Oct. 26, 2012) (discussing cases in which courts have

---

animus.

applied *Garcetti* to in non-employment contexts and concluding that "the law is at best unsettled"). I need not resolve the issue. Even assuming that *Garcetti* does not apply and plaintiff's speech was protected, the proposition was not clearly established at the time of the alleged violation.

### 3. Qualified immunity – retaliatory investigation

Defendants are also entitled to qualified immunity on the First Amendment retaliation claim for another reason: it is unclear whether a retaliatory investigation as opposed to a retaliatory prosecution rises to the level of a constitutional violation, and even if it does this was not clearly established at the time of the alleged violation. Neither the Supreme Court nor the Seventh Circuit has addressed the issue. *See Hartman v. Moore*, 547 U.S. 250, at 262 n.9 ("Whether the expense or other adverse consequences of a retaliatory investigation would ever justify recognizing such an investigation as a distinct constitutional violation is not before us."); *Rakovich v. Wade*, 850 F.2d 1180, 1189 (7th Cir. 1988) (stating in dictum that a retaliatory investigation could be actionable under § 1983 but not analyzing the issue because "[t]he officers [did] not argue[] that the amendment [was] inapplicable").

Other circuits have come to varying conclusions. *Compare Lacey v. Maricopa Cty.*, 649 F.3d 1118, 1132 (9th Cir. 2011) (stating that "an extremely intrusive investigation that did not culminate in an arrest—even when conduct pursuant to a valid mandate—could chill the exercise of First Amendment rights"); *Izen v. Catalina*, 382 F.3d 566, 571–72 (5th Cir. 2004) (recognizing a First Amendment retaliation claim whether defendants "undertook an investigation with the substantial motivation of retaliating against" plaintiff for protected speech); *Worrell v. Henry*, 219 F.3d 1197, 1212

(10th Cir. 2000) ("Any form of official retaliation for exercising one's freedom of speech, including . . . bad faith investigation . . . , constitutes an infringement of [First Amendment] freedom."); *Pendleton v. St. Louis Cty.*, 178 F.3d 1007, 1010–11 (8th Cir. 1999) (concluding that "[d]efendants could not have reasonably believed that their actions comported with clearly established law" when they allegedly conducted a retaliatory criminal investigation), *with Rehberg v. Paulk*, 611 F.3d 828, 850 n.24 (11th Cir. 2010) ("No § 1983 liability can attach merely because the government initiated a criminal investigation."); *Colson v. Grohman*, 174 F.3d 498, 512–13 (5th Cir. 1999) (concluding that an investigation is a harm that is "not actionable under our First Amendment retaliation jurisprudence"). Thus, it was not clearly established at the time of the alleged violation that a retaliatory investigation alone violated the First Amendment.

### 4. Qualified immunity – judicial supervision

While it is unclear whether a retaliatory investigation violates the Constitution, it is even less clear whether a judicially supervised investigation, even if retaliatory in nature, does so. This is significant here because the investigation at issue was initiated and conducted in the context of a John Doe proceeding and was therefore judicially authorized and supervised. While no court has directly addressed the issue, it is likely that judicial approval defeats the plaintiff's retaliation claim. This is so because, as noted, it is generally reasonable for an officer to rely on judicial approval, and thus officers are generally entitled to qualified immunity when they do so. *Malley*, 475 U.S. at 344–45; *Leon*, 468 U.S. at 920–21. Here, every stage of the investigation was authorized by a judge—the initiation of John Doe I, each expansion of it ,and each

search conducted as part of it. Additionally, as I have already concluded, the plaintiff has failed to allege any facts to support the inference that the defendants unreasonably relied on Judge Nettesheim's authorization.

### 5. Qualified Immunity – existence of probable cause

Further, it is likely that the existence of probable cause for the John Doe investigation defeats the plaintiff's retaliatory investigation claim because the existence of probable cause "will suggest that prosecution would have occurred even without a retaliatory motive." *Hartman,* 547 U.S. at 261, 265–66. The plaintiff's own complaint alleges sufficient probable cause for initiating and expanding John Doe I. The plaintiff alleges that Walker's chief of staff Tom Nardelli discovered that money donated by Walker's office to a charity had been stolen and that subsequently, further irregularities were discovered. Am. Compl. ¶ 70, 74. The expansion, which was based on concerns about preferential treatment in the county bidding process and which led to the search warrants involving the plaintiff, clearly resulted from information that the defendants had received. *Id.* ¶¶ 146–47 (discussing a letter notifying the defendants of potential impropriety in the bidding process). Further, as discussed, probable cause supported defendants' conduct within John Doe I including the search of the plaintiff's home. Because the defendants reasonably relied on a finding of probable cause in conducting John Doe I, they are entitled to qualified immunity on the plaintiff's First Amendment retaliation claim.

## C. False Arrest Claim

The plaintiff also alleges that defendants unlawfully detained her while searching her home in violation of the Fourth Amendment. However, officers may detain

occupants of a home while they execute a search warrant supported by probable cause. *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981). Thus, the plaintiff fails to state a claim for false arrest, and defendants are entitled to qualified immunity on this claim as well. Further, even if the warrant were invalid, it was judicially-authorized and the investigators reasonably relied on it. For the same reasons, their detention of the plaintiff was reasonable. *See Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) (an officer is entitled to qualified immunity in a false arrest case when, even if the arrest was not permissible under the Fourth Amendment, a reasonable officer could have mistakenly believed that it was).[16]

**D. Retaliatory Arrest Claim**

The plaintiff also claims that her detention during the search of her home was retaliatory in violation of the First Amendment. Neither the Supreme Court nor the Seventh Circuit has resolved the issue of whether a valid arrest can give rise to a retaliation claim under the First Amendment, and other circuits are split on the issue. *See id.* at 253 (discussing other circuits but not resolving the issue). Thus, even if the plaintiff's retaliatory detention claim was viable, this was not clearly established at the time of the alleged violation. *See id.* (concluding that the right was not clearly established); *see also Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (same). Thus, the investigators are entitled to qualified immunity with respect to this claim.

---

[16] The plaintiff does not allege that the prosecutor defendants played any direct role in her detention. Thus, like her claims based on the execution of the search warrants, the plaintiff has failed allege that the prosecutors defendants are personally liable for her arrest-related claims.

### E. Civil Conspiracy Claim

Finally, the plaintiff brings a civil conspiracy claim. "Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises." *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). Inasmuch as the plaintiff's other claims fail, the plaintiff does not allege the denial of a civil right to justify her civil conspiracy claim. Thus, all the defendants are entitled to qualified immunity on this claim as well.

### F. Conclusion with Respect to Immunity

I previously noted that the purpose of the immunity doctrine is to shield public officials from retaliatory and unfounded litigation and the threat of such litigation so that they are not impaired in doing their jobs. *Imbler*, 424 U.S. at 422–23. The concern underlying the doctrine is that if public officials are subjected to unwarranted litigation, they may shade their decisions and refrain from exercising independent judgment and taking action when they believe it is justified. *Id.* Considering the present case in light of this underlying concern leads to the conclusion that this case provides a textbook example of when immunity should be granted.

As previously discussed, the defendants in the present case pursued a public corruption investigation (John Doe I) and obtained six convictions. Evidence uncovered during the investigation led them to pursue a second public corruption investigation (John Doe II). The subjects of the investigation, however, had significant resources and were willing to bring numerous lawsuits in an attempt to shut the investigation down. It is not an overstatement to say that the opponents of the investigation made it very difficult for the defendants to proceed.

35

Besieging public officials with lawsuits is precisely the kind of activity that can inhibit if not intimidate an official and cause her to refrain from taking action which, however justified, might engender more lawsuits. As discussed above, based on the law, all of the defendants are entitled to either absolute or qualified immunity on all of the plaintiff's claims. I add only that the reason for the immunity doctrine, to enable public officials to do their job free from fear of being subjected to unwarranted litigation, has particular salience in the present case.

### III. Custody of Records

This case also presents a unique question regarding the materials the defendants collected during John Doe II. The state supreme court ordered the defendants to turn over all such materials (and the materials collected during John Doe I which were incorporated into John Doe II), to its clerk. *State ex rel. Three Unnamed Petitioners v. Peterson*, 365 Wis. 2d 351, 373–74 (2015). Initially, the court stated that it would to destroy the materials, but it has since indicated that it will retain them and that the parties may request access to them. *Id.* at 377.

In her dissent, Justice Abrahamson noted that the court's handling of this issue leaves many questions unanswered, including how the court will address the interests of parties in the present case, how the parties should seek access, how long the court will maintain the materials, and even which court (the supreme court or the original John Doe court) may authorize use and dissemination of the materials. *Id.* at 417–18. Since the court issued its most recent order, the investigator defendants who were not parties to the state court proceeding have sought to intervene in that proceeding in order to ensure that they will have access to the materials for use in the present litigation.

Similarly, the prosecutor defendants have sought to intervene; Chisholm in his personal capacity and his assistants who, like the investigators, are not parties to the state court proceeding. In each instance, the state supreme court denied their request without discussion. Dec. 21, 2015 Leib Decl. Ex. 4 (ECF No. 53-5) (December 2, 2015 order denying the investigators' motion to intervene); Feb. 15, 2016 Leib Decl. Ex. 1 (ECF No. 59-1) (January 12, 2016 order denying the prosecutors' motion to intervene).

The defendants, therefore, ask me to permit them to retain custody of the John Doe II and related John Doe I materials until the present case is resolved so that they may use them in defending themselves.[17] The plaintiff opposes the request. Although I am dismissing the present case, my decision no doubt will be appealed, and while the appeal is pending the defendants will have to turn the materials over to the state supreme court unless I grant them some sort of relief. Thus, I must resolve the issue because if I do not and am reversed, the defendants will need the materials that they may no longer have access to.

The situation presents a conflict between the defendants' right to have access to evidence that they may need to defend themselves and the doctrine of comity, which cautions against undue interference with state court proceedings. I have tried to fashion a solution to the problem which ensures that the defendants will have access to the

---

[17] In my view, the materials at issue are unlikely to be relevant to the present case. They deal with materials from John Doe II, in which the plaintiff was not involved, and documents from John Doe I collected after August 10, 2012, a year after the events in the present case occurred. *See Three Unnamed Petitioners*, 365 Wis. 2d at 372–73. However, the plaintiff includes allegations about John Doe II in her amended complaint and insists that John Doe II supports her theory of an ongoing, continued conspiracy against Walker and his associates, and that these materials may, therefore, be relevant. Thus, I cannot avoid addressing the issue of custody of the records.

evidence that they need but also shows respect for the state courts. Thus I will adopt the plan that I suggested to the parties on several occasions. I will not interfere with the state supreme court's order that the defendants turn over all John Doe II and relevant John Doe I documents to its clerk. I will, however, allow the defendants, if they wish, to file copies of such documents with the clerk of this court. The clerk will not docket the materials and will maintain them under seal. When this litigation is concluded, the materials will be destroyed. I will not presently address how a party seeking to access or use the materials should go about doing so, as this question need not be answered unless my dismissal of the present case is reversed and one of the parties wants to access the materials.

This solution addresses the defendants' concerns about forever losing access to the documents by ceding control of them to the state supreme court. It also respects "the dignity" of the state supreme court and the doctrine of comity by keeping within the spirit of the court's order. *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2042 (internal quotations and citations omitted). My goal is to respect the state supreme court's interest in divesting the defendants of control of the materials while seeking to protect their rights in a way "that [does] not unduly interfere with the legitimate activities of the" state court. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10 (1987). I am not upsetting the state court's order but rather adding to it.

The plaintiff argues that I should not address the issue until after the defendants have sought and been denied access to the materials in state court. I disagree for two reasons. First, although I agree that I "should assume that state procedures will afford [defendants] an adequate remedy," *id.* at 15, the state supreme court's handling of the

access to John Doe II documents issue raises questions about whether it would grant the defendants access to relevant materials for use in the present litigation. The court has determined that all of the evidence that the prosecutors gathered has to remain secret, and it has been inflexible about that order. Thus, when a law firm with experience in Supreme Court litigation offered to represent the prosecutors pro bono in seeking certiorari review of the state supreme court's decision shutting down John Doe II, the court prevented it from doing so by refusing the prosecutors' request to allow the firm's lawyers to review the evidence. Order on Mot. to Amend John Doe Secrecy Orders, *State ex rel. Two Unnamed Petitioners v. Peterson*, No. 2014AP296-OA (Wis. Supreme Ct. Feb. 5, 2016). The court's ruling meant that the prosecutors had to file their petition pro se. Further, as discussed, the defendants have twice asked the court for permission to intervene in the state court proceeding so that they could request access to the documents, and the court summarily denied their requests. Additionally, the court has not actually agreed to allow the parties in the present case access to the materials, stating only that the documents might "potentially" be released, and the court has not set forth any procedure by which the parties could seek access to the materials. Based on the court's unwillingness to address the issue of access to documents in any meaningful way, it is entirely possible that once the defendants turn over the materials, they could permanently lose the chance to access them for use in this litigation. That said, my solution is narrowly tailored and designed to be as deferential to the court as possible, while still assuring that defendants will be able to defend themselves in the present lawsuit.

In arguing that I should not address the issue, the plaintiff relies on *Lucas v. Turner*, which dealt with whether a federal court could order state grand jury proceedings to be disclosed for use in federal civil rights litigation. 725 F.2d 1095, 1099 (7th Cir. 1984). The court stated that, in that situation, "comity dictates that the federal courts defer action on any disclosure requests until the party seeking disclosure shows that the state supervisory court has considered his request and has ruled on the continuing need for secrecy." *Id.* (internal quotations and citations omitted). "Otherwise," the court stated, "the potential threat of disclosure orders in subsequent civil litigation would seriously weaken the state court's control over the secrecy of this essential component of its criminal justice system." *Id.* (internal quotations and citations omitted). The plaintiff's argument, however, ignores the distinction between an order relating to control of materials and an order relating to their use and dissemination. My order does no more than permit the defendants to provide copies of the relevant materials to the clerk of this court. It does not address the issue of access to the materials or whether the state supreme court or this court should decide that issue. Thus, the order does not in any way weaken the state court's determination that the records should remain secret.[18]

Contrary to the plaintiff's assertion, my resolution of this issue does not violate the Anti-Injunction Act, which prohibits federal courts from "grant[ing] an injunction to

---

[18] If my dismissal of the plaintiff's suit is reversed and some John II materials are relevant to this litigation, the plaintiff may well be correct that the defendants will first have to seek permission to use the materials from the state court. Assuming that the plaintiff is correct, and the state court denies that request, the plaintiff agrees that under *Lucas*, the defendants may then ask me for an order allowing them to use the materials. The present order ensures that a copy of those materials will be available if I enter such

stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The purpose of the Anti-Injunction Act is to allow state court proceedings "to continue unimpaired by intervention of the lower federal courts." *Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970). My resolution does not impair state court proceedings in any way. To the contrary, it leaves the state court order intact. The existence of a copy of the materials filed under seal with the clerk of this court does not impair the state proceedings. And even if it did, it is within an exception to the Anti-Injunction Act because it is "necessary in aid of [my] jurisdiction." The necessary-in-aid-of-jurisdiction exception authorizes "some federal injunctive relief [when it is] necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the court's flexibility and authority to decide that case." *Id.* at 295. This exception is applicable to the present case, where the state court seeks to divest the defendants of evidence that may well be relevant to this litigation. *See Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 485 (7th Cir. 2015) (opining that the necessary-in-aid-of-jurisdiction exception may apply if, for example, "a state court were to bar a necessary witness from attending a federal trial deposition").

Further, my resolution of the issue does not violate the *Rooker-Feldman* doctrine, which prohibits federal district courts from hearing cases that directly challenge state court judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005). The *Rooker-Feldman* doctrine is narrow and applies only to "cases brought by

---

an order in the future.

state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 283–84. This is not such a case. The defendants do not ask me to review a state court decision, the situation which the *Rooker-Feldman* doctrine aims to avoid, and as noted, my order does not call into question any decision issued by the state court.

### IV. Motions to Seal

The parties have also filed several motions to seal in conjunction with the defendants' preservation motion. There is a presumption of public access to documents filed in federal court, and filings may only remain sealed if the parties show good cause to do so. *See City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014). Specifically, the parties have filed as exhibits documents which they originally filed with the state supreme court in John Doe II. That court sealed *sua sponte* all submissions. While I do not believe that the documents filed contain any confidential information, the Seventh Circuit has instructed that, in relation to John Doe proceedings, "Wisconsin's judiciary must decide whether particular documents . . . should be disclosed" and that "district court[s] should ensure that sealed documents in the federal record stay sealed, as long as documents containing the same information remain sealed in the state-court record." *O'Keefe*, 769 F.3d at 943. Therefore, I will grant the motions to seal.

### V. Conclusion

**THEREFORE, IT IS ORDERED** that prosecutor defendants' motion to dismiss (ECF No. 20) is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that investigator defendants' motion for judgment on the pleadings (ECF No. 36) is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that defendants' motions for order preserving evidence (ECF Nos. 49, 50) are **GRANTED in part**. Defendants may, in addition to complying with the Wisconsin Supreme Court's order regarding the John Doe 2 records, file a copy of all materials filed with the Wisconsin Supreme Court with the Clerk of Court for the Eastern District of Wisconsin. The Clerk shall not docket any of these materials and shall maintain the materials under seal until further order of this court.

**IT IS FURTHER ORDERED** that the parties' motions to seal (ECF Nos. 51, 53, 57) are **GRANTED**.

**IT IS FURTHER ORDERED** that the parties' motions to cite supplemental authority (ECF Nos. 68, 75) are **GRANTED**.

**IT IS FURTHER ORDERED** that investigator defendants' motion to supplement response to the State of Wisconsin's amicus curiae brief (ECF No. 70) is **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's motion to amend/correct her opposition (ECF No. 72) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 26th day of May, 2016.

s/ Lynn Adelman

_____

LYNN ADELMAN
District Judge
